[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 440.]

MALONE ET AL., APPELLEES, *v*. COURTYARD BY MARRIOTT LIMITED

PARTNERSHIP ET AL., APPELLANTS.

[Cite as *Malone v. Courtyard by Marriott L.P.*, 1996-Ohio-311.]

*Torts—Negligence—Safety and well-being of hotel guests—Damages—Absent*
*proof of a defendant's subjective knowledge of danger posed to another,*
*a punitive damages claim against that defendant premised on the*
*"conscious disregard" theory of malice is not warranted.*

Absent proof of a defendant's subjective knowledge of danger posed to another, a
punitive damages claim against that defendant premised on the "conscious
disregard" theory of malice is not warranted.

(No. 94-1413—Submitted November 14, 1995—Decided February 7, 1996.)

APPEAL from the Court of Appeals for Franklin County, No. 93APE10-1407.

———————————

{¶ 1} On July 21, 1989, appellees Lolita Malone and Karen Linda Meador
traveled from Columbus to the Cincinnati area to attend the annual Kool Jazz
Festival. They arrived at a Courtyard by Marriott ("Marriott") in Blue Ash, Ohio,
at approximately 11:30 p.m. and were assigned Room 249. The atmosphere at the
hotel that night was described as being like a college dorm party.

{¶ 2} The tragic series of events underlying this case was set in motion
when Malone and Meador encountered Vincent Gatewood at the hotel elevator.
Gatewood introduced himself as Vincent Michaels and, after some initial small talk,
accompanied Malone and Meador to their room. Gatewood offered to get some
drinks and appellees accepted.

{¶ 3} At approximately 12:30 a.m., while appellees were talking and
drinking with Gatewood, Christopher Letkiewicz, a Marriott security guard,
knocked on the door of Malone and Meador's room and informed them of noise

complaints. Meador told Letkiewicz that they would be more quiet. Shortly thereafter, appellees asked Gatewood to leave the room so they could get dressed to go out to some area bars. Gatewood complied with this request.

{¶ 4} Gatewood returned to the appellees' room around 1:30 and offered to guide them to the clubs. Malone and Meador accepted his offer, and Gatewood led them in a separate car. Appellees and Gatewood drove to three nightclubs between 1:30 and 3:30 a.m., but did not enter any of them. The three of them returned to the Marriott around 3:30 a.m.

{¶ 5} Gatewood accompanied appellees back to their room and opened their door after Meador supplied him with the key. After entering the room, appellees told Gatewood that they were tired, but Gatewood insisted that they have another drink, and the appellees agreed. While Gatewood was out of the room Meador changed into her bed clothes and got into bed. However, Malone did not prepare for bed because she still hoped to see her boyfriend, Brian Hood, that morning. After a few minutes, Gatewood reentered appellees' room with some wine coolers.

{¶ 6} At approximately 3:45 a.m. Malone received a telephone call from Hood, and the two talked about meeting at either the hotel or the home of one of Hood's friends.[1] Hood also spoke with Meador briefly and tried to convince her to accompany Malone, but Meador declined. After Meador handed the telephone back to Malone, Gatewood approached her, leaned on her bed, and suggested that Meador stay at the hotel while Malone went out. At that point, Meador informed Malone that she intended to accompany Malone on her visit to Hood. Meador got out of bed and asked Gatewood to leave so that she could change into her street clothes. Gatewood indicated that he did not want to leave, and Meador repeated

---

1. There was some confusion at trial as to where Malone and Hood were supposed to meet. Malone testified that she was to meet Hood at his friend's residence. Hood testified that he could not recall what the arrangements had been that morning. However, portions of Hood's deposition testimony, which were read while he was on the witness stand, indicated that he had agreed to meet Malone at the Marriott.

her request.  Gatewood became angry and a brief shouting match ensued between Meador and him.  Fearing that Gatewood might become violent, Malone testified that she stepped between Gatewood and Meador and coaxed him out of the room. Gatewood loitered in the hallway for several minutes.

{¶ 7} At this point the account of events that morning diverge significantly. At trial, appellees testified that once Meador was ready to leave with Malone, she realized that she had misplaced her room key.[2]  Assuming that Gatewood still had the key, Malone opened the door and asked Gatewood if he had Meador's key.

{¶ 8} Appellees testified that Gatewood became enraged by this question, rushed the door, entered appellees' room, pushed Malone toward the vanity area and began strangling her.  Meador moved toward Gatewood in an attempt to assist Malone, but Gatewood turned and struck her in the face.  Malone took advantage of this distraction and fled the room in an attempt to get to the elevator at the end of the hall.  Malone testified that Gatewood pursued her down the hallway, grabbed her before the elevator door opened and shoved her into his room, No. 237, which was adjacent to the elevator.  Meador ran down the hallway, screaming for help. Meador saw Gatewood and attempted to gain entry into the room to help Malone. Gatewood first tried to block Meador's entry, but then grabbed her, forced her into the room and threw her up against the wall.  She hit the dresser and landed on Malone.

{¶ 9} However, appellees had related a different version of this portion of events to Jean Reed, a social worker they met with on July 22, 1989.  Reed testified at trial that neither of the appellees mentioned anything to her about the first assault that occurred in their own room.  Reed stated that appellees told her that Gatewood returned to his room after shouting profanities in the hall.  Reed testified that Malone stated that she left her room and walked to the elevator, which she planned

---

2. It was later determined that Meador had simply misplaced the key in appellees' room.

to take to the lobby to complain to the hotel staff about Gatewood. When Malone neared the elevator, Gatewood emerged from his room, grabbed her, and dragged her into his room. Meador, who had been monitoring Malone's progress down the hall, witnessed Gatewood's actions and ran to assist Malone. At this point, appellees' account to Reed and their trial testimony again converge.

{¶ 10} Once Malone and Meador were inside Gatewood's room, they began screaming and pleading with Gatewood to let them go. Gatewood ordered them to be quiet and threatened to kill them if they failed to cooperate. He then told them to undress, and when they failed to comply, he ripped off their clothing. Over the next three hours, Gatewood repeatedly raped appellees, Malone vaginally and Meador anally.

{¶ 11} At approximately 7:00 a.m., Malone, hoping to gain her and Meador's release, told Gatewood that she and Meador were planning to meet friends in their room that morning, and that their absence might make their friends suspicious. Gatewood agreed to let appellees go, but told them that if they reported the rapes to the authorities, relatives of his in Columbus would find them and "get" them.

{¶ 12} Upon leaving Gatewood's room, the appellees went to the hotel lobby to get another key to their room. After obtaining a new key, appellees briefly returned to their room and then went to a local hospital. They informed hospital personnel that they had been raped and were examined by a physician. As recounted above, they also spoke to Reed, as well as representatives of the Blue Ash Police Department. Criminal charges were brought against Gatewood, but the record in this case is silent on the outcome of those proceedings.

{¶ 13} On September 18, 1990, appellees filed a complaint in Franklin County Common Pleas Court against both Gatewood and Courtyard by Marriott, although Gatewood was later dropped as a party to the civil action. This complaint was amended after the close of evidence at trial to include the Marriott Corporation.

4

In their amended complaint, appellees asserted that Marriott personnel negligently failed to respond to reports by other hotel guests of an "abusive situation." Appellees also stated that Marriott's alleged failure to respond to these calls from other guests was "willful, wanton, and reckless, and demonstrated a conscious disregard for the safety and well being of Malone and Meador when a great probability of harm existed," entitling appellees to punitive damages.

{¶ 14} The matter went to trial on June 21, 1993. Apart from the testimony of Malone, Meador, Hood, Letkiewicz and Reed, other relevant testimony included videotaped depositions of Michael and Leslie Macke and Eunela Williams, and subsequent live testimony by Mr. Macke. These three individuals were guests at the Marriott on the same night that Malone and Meador were sexually assaulted.

{¶ 15} Mr. Macke, who was in Room 247, the room adjoining appellees' room, testified that he made three separate calls to the Marriott front desk on the morning of July 22. He first called at approximately 1:30 a.m. to make a general complaint about the level of noise and partying throughout the wing of the building in which he and his family were staying.

{¶ 16} His second call was placed around 3:30 a.m. after he had been awakened by a loud thud against the wall adjacent to the headboard of the bed. Macke assumed that this noise came from the room on the opposite side of the wall. His subsequent live testimony revealed that Macke had been referring to Room 245, which was neither appellees' nor Gatewood's room. During his deposition testimony, Macke stated that he informed the front desk that "something had happened, that maybe there was some — some furniture being damaged or potentially being damaged or someone might be getting hurt * * *, something was happening that was not good and I thought perhaps they ought to come up and check it out." Macke testified that his third and final call was made between 4:30 a.m. and 4:45 a.m., after appellees were already in Gatewood's room. The substance of this call, as Macke related it at trial, was that "something was going

on, that someone might need some assistance, that I really didn't know, but there were people running down the hall * * *."

{¶ 17} Leslie Macke's testimony differed somewhat from her husband's on two particulars. First, Mrs. Macke testified that only three or four minutes elapsed between her husband's second and third calls to the front desk, rather than the hour to hour and fifteen minutes to which Mr. Macke testified. The second significant inconsistency between Mr. and Mrs. Macke's testimony was Mrs. Macke's recollection of the substance of her husband's third call to the front desk. It was her testimony that Mr. Macke told the front desk that "[n]ow the girl is screaming in the hallway for help."

{¶ 18} Eunela Williams also contacted the front desk on the morning of July 22, although there was some confusion in her testimony concerning the number and timing of the calls she made that morning. Williams first asserted that she made only one call to the desk after her husband and she were awakened by a loud bump at approximately 4:00 a.m. After listening to what she assumed was a domestic squabble for approximately ten to fifteen minutes, she called the front desk. She then moved back the time of her call to roughly two to three minutes after her husband and she were awakened by the noise. She stated that she made only one call.

{¶ 19} After being pressed by appellees' counsel, however, Williams acknowledged that she did make two calls, the first a few minutes after she was awakened and the second ten to fifteen minutes after the first. Williams testified that during one of her calls she asked the front desk "to send a security guard up because they were fighting and making a lot of noise." Williams specifically recalled that her second call consisted of a request for the front desk to "send someone up."

{¶ 20} After the close of evidence, Marriott moved for a directed verdict on all of the appellees' claims. Judge Beverly Pfeiffer granted the motion on the

punitive damages claim, but permitted the negligence claims to proceed to the jury. The jury rendered a general verdict in favor of the defendants and against Malone, finding that Malone had been fifty-one percent comparatively negligent, and that her comparative negligence directly and proximately caused her injuries. The jury also found that Meador had been comparatively negligent, but determined that her negligence was not a cause of her injuries. The jury awarded Meador $300,000 in compensatory damages.

{¶ 21} Marriott moved for judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. Appellants' motion for JNOV was overruled, but the trial court sustained the motion for a new trial on the grounds that the verdict for Meador was against the manifest weight of the evidence and the damages awarded were excessive.

{¶ 22} Malone and Meador appealed. A split panel of the Franklin County Court of Appeals ruled that the directed verdict and the order for a new trial were erroneous. The appeals court opined that the testimony offered at trial established sufficient evidence of Marriott's conscious disregard for appellees' safety to create a question for the jury on the issue of punitive damages.

{¶ 23} On the issue of the trial judge's order for a new trial, the court of appeals recognized that "the decision to grant a motion for a new trial rests within the sound discretion of the trial court, and that ruling will not be disturbed by a reviewing court absent a showing that the trial court abused its discretion." However, the court of appeals cast the abuse of discretion standard of review in terms of whether the verdict was supported by substantial evidence. After reviewing the evidence presented at trial, the court of appeals concluded that substantial evidence existed to support the jury's damage award to Meador, and that the trial court's order for a new trial on both grounds cited was erroneous.

{¶ 24} The cause is now before this court pursuant to the allowance of a discretionary appeal.

———————————

*Lane, Alton & Horst, Gregory D. Rankin, Patrick H. Boggs* and *Robert B. Graziano,* for appellees.

*Squire, Sanders & Dempsey, David W. Alexander* and *Scott B. Pfahl,* for appellants.

———————————

**WRIGHT, J.**

**{¶ 25}** At its core, this case presents two questions for our consideration. First, was the trial court's grant of Marriott's motion for a directed verdict on the issue of punitive damages error?  Second, was the judge's order for a new trial on Meador's negligence claim error?  We answer these queries in the negative.

**{¶ 26}** Judge Pfeiffer's directed verdict on the question of punitive damages should have been affirmed by the court of appeals.  In determining whether to direct a verdict, the trial court does not engage in a weighing of the evidence, nor does it evaluate the credibility of witnesses.  *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 67-68, 23 O.O.3d 115, 116, 430 N.E.2d 935, 937.  Rather, the court is confronted solely with a question of law:  Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?  *Id*. at 68-69, 23 O.O.3d at 116, 430 N.E.2d at 938.  A motion for a directed verdict may be granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."  Civ.R. 50(A)(4).

**{¶ 27}** The law of Ohio is clear on when punitive damages may be awarded:

"[P]unitive or exemplary damages are not recoverable from a defendant in question in a tort action unless *both* of the following apply:

"(1) The actions or omissions of that defendant demonstrate malice * * *, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate; [and]

"(2) The plaintiff in question has adduced proof of actual damages that resulted from actions or omissions as described in division (B)(1) of this section." (Emphasis added.) R.C. 2315.21(B).

{¶ 28} Thus, as a threshold matter, Malone and Meador were obligated to present evidence of malice on the part of Marriott before their claim for punitive damages could proceed to the jury.

{¶ 29} Our case law defines "malice" as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*) *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. Because R.C. 2315.21 does not provide its own definition of "malice," this court has continued to apply *Preston*'s definition. *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 640 N.E.2d 159, paragraph one of the syllabus; *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, paragraph one of the syllabus.

{¶ 30} The first type of malice articulated in *Preston* is not germane to this matter. Appellees argued, however, that sufficient evidence had been introduced at trial to create a question for the jury on the second definition of malice. Specifically, appellees' counsel pointed to the testimony of Eunela Williams, who stated that she contacted the front desk twice, roughly between 4:00 and 4:20 a.m., because she had heard an argument coming from Gatewood's room. Appellees contend that Marriott's failure to respond to Williams's complaints constituted a conscious disregard for the safety of Malone and Meador, and created a great probability of harm to them. As a matter of law, this portrayal of Marriott's response is inaccurate.

**{¶ 31}** Marriott's alleged nonfeasance cannot be characterized as malice because the information provided to its employees was too ambiguous. In Williams's two telephone calls to the front desk, she complained only of someone "fighting and making a lot of noise," and she requested that the front desk "send someone up." Williams did not provide the front desk with information on the nature of the disturbance, and in her deposition testimony she characterized the noise from Gatewood's room as a domestic quarrel.

**{¶ 32}** The apparent miscommunication between Williams and the front desk staff is significant because of this court's pronouncements on the "conscious disregard" theory of malice. As Chief Justice Moyer noted in *Preston,* an award of punitive damages based on conscious disregard malice requires "a positive element of conscious wrongdoing * * *. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d at 1176.

**{¶ 33}** In other words, Marriott, through its agents, must have actually known of the threat to its guests. Absent such proof of a defendant's subjective knowledge of the danger posed to another, a punitive damages claim against that defendant premised on the "conscious disregard" theory of malice is not warranted. Since nothing in Williams's calls to the front desk provided Marriott personnel with information about the physical threat confronting appellees, a charge to the jury on punitive damages would have been unjustified. Accordingly, the trial court's decision to direct the verdict was appropriate.

**{¶ 34}** It is significant to note that even if punitive damages were warranted in this case, Malone could not recover them because the jury did not award her compensatory damages. As we have held time and again, punitive damages may not be awarded when a jury fails to award compensatory damages. *Bishop v. Grdina* (1985), 20 Ohio St.3d 26, 27, 20 OBR 213, 214, 485 N.E.2d 704, 705.

**{¶ 35}** The appellees attempt to circumvent this bar to Malone's recovery of punitive damages by pointing out that Malone failed to recover compensatory damages under the negligence theory only because the jury found that she had been fifty-one percent comparatively negligent. Since comparative negligence is not available as an affirmative defense for an action based on recklessness, appellees theorize that Malone could have recovered compensatory damages on a recklessness theory. Such an award would also allow Malone to overcome the bar to punitive damages that was articulated in *Bishop* and elsewhere.

**{¶ 36}** Appellees then assert that the allegation of recklessness in count three of their complaint actually constituted a claim for both punitive *and* compensatory damages. The trial court's decision to direct a verdict on the third count of their complaint thus prevented the jury from addressing recklessness as a basis for compensatory damages as well as punitive damages. If the directed verdict on that issue were to be reversed, appellees contend that Malone could still attempt to recover compensatory and punitive damages.

**{¶ 37}** Although the court of appeals found this argument persuasive, it is flawed in one vital respect: there is absolutely *no* indication in the pleadings, including the complaint amended after the close of evidence, that appellees ever pursued a compensatory damages claim based on recklessness. In the first two counts of their amended complaint, Malone and Meador asserted negligence on the part of appellants and enumerated the harms for which they were seeking damages. In the third count of the amended complaint, the appellees alleged that Marriott had engaged in "willful, wanton, and reckless" behavior on the morning of July 22, 1989 and had shown "conscious disregard for the safety and well being of Malone and Meador when a great probability of harm existed, and as such, [Malone and Meador were] entitled to punitive damages." In no reasonable way can the appellees' complaint be read as advancing a claim for compensatory damages based on recklessness. Consequently, the jury was not deprived of an opportunity to

determine the merits of such a claim, and Malone is not entitled to a new action based on recklessness.

{¶ 38} The trial court's decision to order a new trial on Meador's negligence claim was not erroneous, and the court of appeals' reversal of that order was unfounded. Judge Pfeiffer's order was predicated upon two subsections of Civ.R. 59(A), which state:

"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

"* * *

"(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

"* * *

"(6) The judgment is not sustained by the weight of the evidence * * *."

{¶ 39} In evaluating the propriety of the trial court's decision premised on the weight of the evidence, we must note that a reviewing court can reverse such an order for a new trial only upon a finding of an abuse of discretion. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus. "Abuse of discretion" connotes "an unreasonable, arbitrary or unconscionable attitude upon the part of the court." *Poske v. Mergl* (1959), 169 Ohio St. 70, 75, 8 O.O.2d 36, 39, 157 N.E.2d 344, 348, citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855; *Klever v. Reid Bros. Express, Inc.* (1951), 154 Ohio St. 491, 43 O.O. 429, 96 N.E.2d 781. In addition, the abuse of discretion standard requires a reviewing court to "view the evidence favorably to the trial court's action rather than to the original jury's verdict." *Rohde*, 23 Ohio St.2d at 94, 52 O.O.2d at 382, 262 N.E.2d at 692. This deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness

credibility and the "surrounding circumstances and atmosphere of the trial." *Rohde*, 23 Ohio St.2d at 94, 52 O.O.2d at 382, 262 N.E.2d at 692.

{¶ 40} It is also important to note that the order of a new trial does not terminate a case; instead, it simply grants a *new* trial. Unlike directed verdicts and judgments notwithstanding the verdict, an order for a new trial does not dispose of litigation; instead, its purpose is to prevent "'miscarriages of justice which sometimes occur at the hands of juries,'" by presenting the same matter to a new jury. *Rohde*, 23 Ohio St.2d at 93, 52 O.O.2d at 382, 262 N.E.2d at 692, quoting *Holland v. Brown* (1964), 15 Utah 2d 422, 426, 394 P.2d 77, 79.

{¶ 41} In light of the standard of review and the policies underlying it, the trial court's order for a new trial based upon the weight of the evidence does not appear to be arbitrary or capricious, given the evidence presented at trial and the seemingly contradictory verdicts rendered by the jury. As Judge Pfeiffer stated in her decision of August 27, 1993, no proof of pecuniary loss to Meador was offered at trial. The most compelling consideration in support of the trial judge's order, however, was the jury's incongruous determinations regarding Meador's and Malone's comparative negligence.

{¶ 42} The jury interrogatory forms indicate that both appellees were found negligent, but only Malone's negligence was found to have caused her injuries. Such a disparate set of outcomes is difficult to understand when, as the trial judge noted, both Malone and Meador "invited Gatewood * * * to their room, had drinks with him, went out to several bars, and upon return again allowed him in their room." The trial court went on, recalling that "there were several opportunities for [Meador] to have called either hotel security or other law enforcement for assistance. For example, Gatewood took Malone to his room leaving Meador outside free to return to her room and phone for assistance or knock on doors of other hotel guests for help."

**{¶ 43}** A reasonable person confronted by such a set of facts could validly conclude that the jury's verdict for Meador was against the manifest weight of the evidence. We therefore find no abuse of discretion on the part of the trial court in its determination that the verdict was not supported by the weight of the evidence. Accordingly, it is unnecessary for us to address the trial court's conclusion that the verdict was excessive. We reverse the judgment of the court of appeals and reinstate both the trial court's directed verdict and its order for a new trial for Meador.

*Judgment reversed.*

MOYER, C.J., PFEIFER and COOK, JJ., concur.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., dissent.

_____

**ALICE ROBIE RESNICK, J., dissenting.**

**{¶ 44}** I would affirm the court of appeals' decision in its entirety.

_____