[Cite as *Wisselgren v. Corell*, 2018-Ohio-3438.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| RUTH M. WISSELGREN, et al., | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiffs - Appellees | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| THOMAS L. CORELL, et al., | : | Case No. 2018CA00001 |
| | : | |
| Defendants - Appellants | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Case No. 2015 CV 02616

JUDGMENT:      Affirmed in part, Reversed and Remanded in part

DATE OF JUDGMENT:      August 24, 2018

APPEARANCES:

For Plaintiffs-Appellees

BRIAN L. ZIMMERMAN
229 - 3rd Street N.W.
Canton, Ohio 44702

For Defendants-Appellants

REX W. MILLER
4150 Belden Village Street N.W.
Suite 606 Belden Place
Canton, Ohio 44718

MARK R. PERCIVAL
1231 Lincoln Way East
Massillon, Ohio 44646

*Baldwin, J.*

{¶1} Defendants-appellants Thomas L. Corell and Sharron Corell appeal from the January 10, 2017, November 3, 2017, and December 4, 2017, Orders/Entries of the Stark County Court of Common Pleas.

STATEMENT OF THE FACTS AND CASE

{¶2} Marjorie B. Corell ("Marjorie") died on October 25, 2015 at the age of 98 and was, at the time of her death, the sole owner of two parcels of real estate located in Beach City, Ohio.   Appellant Thomas L. Corell is her son and appellees are her daughter and two of her grandchildren.

{¶3} On December 16, 2015, plaintiffs-appellees Ruth M. Wisselgren, Renee L. Ryks and Brian S. Agnes filed a complaint against defendants-appellants Thomas L. Corell and Sharron Corell, his wife. Appellees, in their complaint, alleged that defendant-appellant Thomas L. Corell intentionally interfered with their expectance of inheritance. Appellees specifically alleged that he committed fraud or exerted duress and/or undue influence upon his mother, Marjorie in an effort to cause her to execute a Transfer on Death Designation Affidavit on or about August 8, 2014, which named appellant Thomas L. Corell the sole beneficiary of specified real property to the exclusion of appellees. Appellees also sought a declaratory judgment as to their "rights, status and other legal relations regarding the real property that was owned by Marjorie B. Corell" and sought a declaratory judgment as to the subject property and their inheritance rights. Appellees, in their complaint, sought punitive damages against appellant Thomas L. Corell and attorney fees.

{¶4} On December 16, 2015, appellees also filed a Motion for Temporary Restraining Order and Preliminary Injunction to prohibit appellants from transferring or otherwise encumbering the subject real estate. A Temporary Restraining Order was filed on December 17, 2015. The trial court, pursuant to an Order filed on January 12, 2016, entered an order of preliminary injunction against appellants.

{¶5} Appellants, on February 4, 2016, filed a joint answer to the complaint and appellant Thomas L. Corell asserted a counterclaim against appellee Ruth M. Wisselgren. In his counterclaim, he asserted that appellee Ruth M. Wisselgren served as Power of Attorney in fact for Marjorie, who was her mother, during Marjorie's life pursuant to a Power of Attorney and that she had wrongfully misappropriated Marjorie's money. Appellee Ruth M. Wisselgren filed an answer to the counterclaim on February 10, 2016.

{¶6} Plaintiffs-appellees filed a "Notice of Voluntary Dismissal of their Declaratory Judgment Request" on July 12, 2016. Thereafter, a bench trial was held on October 20 and 21, 2016.

{¶7} At the bench trial before a Magistrate, there was testimony that Marjorie had been married to Norman Corell and that they had three children, appellee Ruth Wisselgren, Norma Corell, who is deceased, and appellant Thomas L. Corell. At the time of her death, Marjorie was the sole owner of two parcels of real estate located in Beach City, Ohio. The property consisted of approximately 48 acres of land, primarily used for farming with a single-family home located thereon. Appellant Thomas Corell had operated the farm sine 1978 and was living in the home with his wife, appellant Sharron Corell. He was born and raised in the home, which had been jointly owned by his parents. His mother, Marjorie, had been born on the farm in 1917 and at the time of her death in 2015,

the property had been in the family bloodline for over 200 years. Norman, her husband, died in March of 1963 and, following his death, the property was transferred completely into Marjorie's' name.

{¶8}   Marjorie, on April 9, 1963, executed her Last Will and Testament which provided that the farm property and farmhouse would be equally divided between her three children upon her death.  She had repeatedly voiced her intention to keep the property in the family bloodline throughout her life. In 1981, appellant Thomas L. Corell divorced his then wife, Delores.  During the divorce proceedings, Marjorie expressed concern that that she did not want Delores to have any part of the farm because she was not a blood relative. Delores did not end up with any part of the farm. Nor did appellant's second wife, Diane.

{¶9}   In 1993, Marjorie transferred ownership of the property in equal shares to her three children via a Warranty Deed while maintaining a life estate. In 1996, Marjorie's' daughter and appellant's sister, Norma, passed away. At the time of her death, Norma was married to Arden Agnes and they had two children, appellees Renee Ryks and Brian Agnes.   As a result of Norma's death, her one-third share of the property transferred to Arden, her surviving spouse, through the 1993 Warranty Deed   Because she wanted to keep the property in the direct family bloodline, Marjorie asked Arden to transfer his portion of the property and give it back to her so that she could make a new will. On July 26, 1996, via a Quitclaim Deed with a dower clause, Arden Agnes, appellee Ruth Wisselgren and appellant Thomas L. Corell, along with their respective spouses, executed a quitclaim deed transferring ownership of the property back into Marjorie's name.

{¶10} Marjorie, on July 23, 1996, executed a new Last Will and Testament wherein she divided her entire estate, including the subject property, into three equal shares. One share went to her daughter, appellee Ruth Wisselgren, one went to her son, appellant Thomas L. Corell, and one went to appellees Renee Ryks and Brian Agnes, her grandchildren from Norma. The 1996 Last Will and Testament, which was prepared and witnessed by Attorney Sandra Watkins Cleaver, who became Marjorie's attorney in 1996, further provided that appellant Thomas L. Corell would have the first right to purchase the property from the estate at the appraised value at the time of Marjorie's death if the property was offered for sale by the estate.

{¶11} In 2009, appellant Thomas and his third wife, appellant Sharron Corell were attempting to sell their home and had moved briefly into Marjorie's home, located on the property. Appellant Thomas L. Corell testified that in 2010, after he had moved in with his mother, Marjorie began telling his sister Ruth Wisselgren and niece Renee that he should get 100% of the farm. When asked, he agreed that this was inconsistent with what his mother had been saying for the last 47 years. Because their house did not sell as quickly as they had hoped, appellants moved back into their home until it was sold in 2011.

{¶12} On January 4, 2011, Marjorie executed a Transfer on Death Designation Affidavit prepared by Attorney Cleaver that again divided the property into three equal shares between, appellee Ruth Wisselgren, appellant Thomas L. Corell, and the remaining appellees, who are Norma's two children. The Affidavit also provided that should Ruth predecease Marjorie, Ruth's one-third interest in the property would pass to her two natural daughters, in equal part, and that should appellant Thomas L. Corell

predecease Marjorie, his share would be divided equally between Ruth and Norma's two children.

{¶13} In 2011, after the sale of their home, appellants moved back in with Marjorie in her home, located on the property but did not pay any rent and kept the profits from working the farm. In late 2011, Marjorie's' physical health began to decline, and she needed help with her meals, bathing, dressing and going places including church. Prior to 2011, she had been in good health and self-sufficient.  In 2011, appellants borrowed $40,000.00 from his mother and executed a promissory note wherein appellants agreed to repay the money by making $500.00 monthly payments plus four percent (4%) interest. Appellant Thomas L. Corell, at trial admitted that, during his deposition, he had falsely testified that his mother had not loaned him any money and he testified that he had never paid any of the money back.

{¶14} In 2014, appellant Thomas L. Corell approached his sister, Ruth and his niece, Renee, and offered to purchase their respective shares of the subject property for $20,000.00 each. They rejected his offer and later approached him and told him that they would be willing to sell their shares for approximately two-thirds of the appraised value of the property. He told them that he could not afford to pay such amount. Appellant Thomas L. Corell then telephoned and talked to Sandra Cleaver, his mother's attorney. He testified that his mother told Cleaver that she wanted to give him all of the farm and that it was his mother's idea to call Cleaver. Attorney Cleaver then prepared a Transfer on Death Designation Affidavit that transferred the entire ownership of the property to appellant Thomas L. Corell. Marjorie executed the same on or about May 24, 2014 in the presence of a notary public, but it was never recorded.

**{¶15}** On May 27, 2014, Marjorie executed a forgiveness of the $40,000.00 promissory note.

**{¶16}** During a subsequent private meeting with Attorney Cleaver at Marjorie's house, Marjorie told Attorney Cleaver that she did not want to give 100% of the property to appellant Thomas L. Corell. Thereafter, on June 24, 2014, Marjorie executed a Quitclaim Deed transferring a life estate in the subject property to appellant Thomas L. Corell. The deed was prepared and notarized by Attorney Cleaver and was recorded.

**{¶17}** Appellant Thomas L. Corell, however, did not want a life estate because his sister would be overseeing his operation of the farm and would benefit from his work on the farm. Attorney Mark Percival, who was appellants' attorney, met with Marjorie in July and August of 2014. He testified that appellant Thomas L. Corell, who made the appointment, brought Marjorie to his office on July 29, 2014 and that assisted Marjorie into his office because she was 96 years old at the time and in declining health. Attorney Percival testified that Marjorie told him that she wanted appellant Thomas L. Corell to have the farm and that he had no idea during his meeting with her that for the previous 51 years, she had repeatedly indicted that she made every attempt to divide the farm equally between her three children. He also did not know that at that point in time, appellant Thomas L. Corell was living at Marjorie's house rent free, that she was paying expenses for the farm or that appellant Thomas L. Corell was keeping all of the profits from the farm. He also was unaware that appellants had borrowed $40,000.00 from Marjorie in 2011 but that, in 2014, she had agreed to waive payment of the loan.

**{¶18}** Attorney Percival prepared a Transfer on Death Designation Affidavit that transferred a 100% ownership interest in the Property to appellant Thomas L. Corell upon

Marjorie's death. On August 8, 2014, Marjorie signed the Affidavit which was recorded. She broke her hip in June of 2015 and died on October 25, 2015. Appellants had paid Attorney Percival for the services that were performed on Marjorie's behalf.

{¶19} Marjorie died on October 25, 2015 after breaking her hip in June of 2015.

{¶20} The Magistrate, in a Decision filed on January 10, 2017, recommended that the August 8, 2014 Transfer on Death Affidavit be declared invalid, that punitive damages in the amount of $40,000.00 be awarded in favor of appellees and against appellant Thomas L. Corell because appellant Thomas L. Corell had "acted with malice and a total disregard for the rights of" appellees and that appellees be awarded attorney fees pursuant to R.C. 2315.21. An evidentiary hearing on the amount of fees was scheduled for February 10, 2017. The Magistrate, in a Decision filed on November 3, 2017, recommended that appellees be awarded attorney fees in the amount of $49,587.50. After appellants filed objections to the Magistrate's Decision, the trial court, pursuant to a Judgment Entry field on December 14, 2017, overruled the objections and approved and adopted the Magistrate Decisions dated January 10, 2017 and November 3, 2017. The trial court rendered judgment in favor of appellees and against appellant Thomas L. Corell and voided the Transfer on Death Designation Affidavit prepared by Attorney Percival, awarded punitive damages in favor of appellees and against appellant Thomas L. Corell in the amount of $40,000.00 plus attorney fees in the amount of $49,587.50 or a total punitive damage award of $89,587.50.

{¶21} Appellants now raise the following assignments of error on appeal:

{¶22} "I. THE TRIAL COURT JUDGMENT AWARD OF PUNITIVE DAMAGES IS CONTRARY TO LAW BECAUSE THE TRIAL COURT (1) DID NOT MAKE AN AWARD

OF COMPENSATORY DAMAGES, AND (2) DID NOT MAKE FINDINGS SUPPORTING A CONCLUSION OF ACTUAL MALICE."

{¶23} "II. THE TRIAL COURT'S JUDGMENT AWARD OF ATTORNEY FEES IS CONTRARY TO LAW BECAUSE (1) THERE WAS NOT A PROPER AWARD OF PUNITIVE DAMAGES AND (2) THE TRIAL COURT JUDGMENT DECLARING THE AUGUST 8, 2014 TRANSFER ON DEATH DESIGNATION AFFIDAVIT INVALID DOES NOT ENTITLE AN AWARD OF ATTORNEY FEES AND (3) THE RECORD WAS NOT SUFFICIENT TO ENABLE THE TRIAL COURT TO DETERMINE THE LODESTAR NUMBER."

{¶24} "III. THE TRIAL COURT JUDGMENT INVALIDATING THE AUGUST 2014 TRANSFER ON DEATH DESIGNATION AFFIDAVIT IS CONTRARY TO LAW BECAUSE (1) NO CLAIM FOR DECLARATORY JUDGMENT WAS BEFORE THE COURT, (2) THERE IS NO CONCLUSION OF LAW THAT MARJORIE B. CORELL WAS SUSCEPTIBLE TO UNDUE INFLUENCE AT THE TIME SHE EXECUTED THE AUGUST 8, 2014 TRANSFER ON DEATH DESIGNATION AFFIDAVIT AND NO FINDINGS OF FACT SUFFICIENT AT LAW TO SUPPORT SUCH A CONCLUSION IF ONE HAD BEEN MADE, (3) THERE ARE NO FINDINGS OF FACT TO SUPPORT A CONCLUSION THAT ANY INFLUENCE BY TOM WAS IMPROPER."

{¶25} "IV. THE TRIAL COURT JUDGMENT INVALIDATING THE AUGUST 2014 TRANSFER ON DEATH DESIGNATION AFFIDAVIT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE (1) THE TESTIMONY OF RUTH, RENEE AND BRIAN WAS THAT MARJORIE WAS NOT SUSCEPTIBLE TO UNDUE INFLUENCE, AND (2) THE EVIDENCE WAS THAT MARJORIE FAVORED TOM OVER RUTH,

RENEE AND BRIAN AND THEREFORE EXECUTION OF THE AUGUST 8, 2014 TRANSFER ON DEATH AFFIDAVIT WAS NOT THE RESULT OF UNDUE INFLUENCE."

{¶26} "V. THE TRIAL COURT JUDGMENT TAXING COSTS TO SHARRON CORELL IS CONTRARY TO LAW BECAUSE (1) COMPLAINT, COUNTY TWO WAS VOLUNTARILY DISMISSED PRIOR TO TRIAL, SHE WAS NOT A DEFENDANT AS TO COUNTS ONE AND THREE OF THE COMPLAINT AND WAS NOT A PARTY TO THE COUNTERCLAIM (WHICH WAS VOLUNTARILY WITHDRAWN BY THOMAS L. CORELL AT TRIAL) AND (2) THERE ARE NO FINDINGS OF FACT AND NO CONCLUSIONS OF LAW WITH RESPECT TO SHARRON CORELL."

I

{¶27} Appellants, in their first assignment of error, argue that the trial court erred in awarding punitive damages.  We agree.

{¶28} Appellants first argue that the trial court did not have authority to award punitive damages in the absence of an award of compensatory damages.

{¶29} R.C. 2315.21 states, in relevant part, as follows:

{¶30} [B](3) In a tort action that is tried to a court and in which a plaintiff makes a claim for both compensatory damages and punitive or exemplary damages, the court shall make its determination with respect to whether the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant and, if that determination is in favor of the plaintiff, shall make findings of fact that specify the total compensatory damages recoverable by the plaintiff from the defendant.

**{¶31}** (C) Subject to division (E) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

**{¶32}** (1) The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

**{¶33}** (2) The trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by the plaintiff from that defendant.

**{¶34}** (D)(1) In a tort action, the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages.

**{¶35}** (2) Except as provided in division (D)(6) of this section, all of the following apply regarding any award of punitive or exemplary damages in a tort action:

**{¶36}** The court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to division (B)(2) or (3) of this section.

**{¶37}** The award of punitive damages requires the finding of some compensatory damages. *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 447, 1996-Ohio-311, 659 N.E.2d 1242, *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 495 N.E.2d 391 (1986).

**{¶38}** The compensatory-damages requirement prevents plaintiffs from bringing cases solely for an award of punitive damages; they are not independent remedies.

"Punitive damages are awarded as punishment for causing compensable harm and as a deterrent against similar action in the future. No civil cause of action in this state may be maintained simply for punitive damages." *Bishop v. Grdina*, 20 Ohio St.3d 26, 28, 485 N.E.2d 704 (1985), superseded by rule on other grounds. See also *Moskovitz v. Mt. Sinai Med. Ctr* , 69 Ohio St.3d 638, 650, 1994-Ohio-324, 635 N.E.2d 331 ("[p]unitive damages are awarded as a mere incident of the cause of action in which they are sought. * * * Thus, compensable harm stemming from a cognizable cause of action must be shown to exist before punitive damages can be considered").

**{¶39}** "Compensatory damages are intended to make whole the plaintiff for the wrong done to him or her by the defendant. * * * Compensatory damages are defined as those which measure the actual loss, and are allowed as amends therefore." *Fantozzi v. Sandusky Cement Products Co.,* 64 Ohio St.3d 601, 612, 1992-Ohio-138, 597 N.E.2d 474.

**{¶40}** In the case sub judice, the Magistrate, in her January 10, 2017 Decision that was approved and adopted by the trial court, found that appellees had suffered damage as a result of appellant Thomas L. Corell's interference. The trial court specifically found that based on his interference, appellees were "precluded from inheriting their respective portions of the Property, which has a total value of $419,000.00. The trial court then found that appellee Wisselgren should have inherited one-third of the property and appellees Ryks and Agnes should have inherited their mother Norma's third of the property. The trial court, however, did not make an award of compensatory damages or enter any monetary judgment against appellants, but rather voided the

Transfer on Death Designation that was prepared by Attorney Percival and executed by Marjorie.

**{¶41}** We find that the trial court did not award compensatory damages and that, therefore, the trial court erred in awarding punitive damages.

**{¶42}** Appellants' first assignment of error is, therefore, sustained.

II

**{¶43}** Appellants, in their second assignment of error, contend that the trial court's award of attorney fees was contrary to law. The trial court had awarded attorney fees pursuant to R. C. 2315.21 based on its award of punitive damages.

**{¶44}** "It is well-settled that the award of attorney fees is appropriate in two specific instances. The first, where statutorily authorized, is not applicable here. The other instance in which the award of attorney fees is authorized is in situations when punitive damages would be appropriate, *i.e.* the conduct is so egregious as to constitute fraud, malice, bad faith or wantonness. *Columbus Finance v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975); *Village of Oakwood v. Makar*, 11 Ohio App.3d 46, 463 N.E.2d 61 (1983).

**{¶45}** In *Griffin v. Lamberjack*, 96 Ohio App.3d 257,266, 644 N.E.2d 1057 (6th Dist. 1994) the court held that attorney fees are recoverable as compensatory damages where punitive damages have been found to be warranted**.**

> The award of attorney fees, although seemingly compensatory *** does not compensate the victim for damages flowing from the tort. Rather, the requirement that a party pay attorney fees under these circumstances is a punitive (and thus equitable) remedy that flows from a jury finding of

malice and the award of punitive damages. There is no separate tort action at law for the recovery of attorney fees under these circumstances. Without a finding of malice and an award of punitive damages, plaintiff cannot justify an award of attorney fees, unless there is a basis for sanctions under Civ.R. 11.

{¶46} Attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted. *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 183, 327 N.E.2d 654, 658 (1975). In other words, "[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted." *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 558, 644 N.E.2d 397, 402 (1994).

{¶47} Having found that the trial court erred in awarding punitive damages, we find that the trial court erred in awarding in awarding attorney fees pursuant to R.C. 2315.21.

{¶48} Appellants' second assignment of error is, therefore, sustained.

III, IV

{¶49} Appellants, in their third and assignments of error, maintain that the trial court erred in invalidating the August 2014 Transfer on Death Designation Affidavit. We disagree.

{¶50} The Magistrate, in her January 10, 2017 Decision that was approved and adopted by the trial court, voided the Transfer on Death Designation that was prepared by Attorney Percival and executed by Marjorie Corell. Appellants, in their complaint, sought a declaratory judgment, but filed a Notice of Voluntary Dismissal of their

Declaratory Judgment Request on July 12, 2016. Appellants now assert, in part, that the court's judgment invalidating the Transfer on Death Designation Affidavit was contrary to law because there was no claim for declaratory judgment before the trial court.

**{¶51}** Appellees, in their complaint, sought "such further other relief" to which they may be entitled. "The function of equitable relief is to supplement the law where the law is insufficient to remedy a wrong." *Barone v. Barone,* 11th Dist. Geauga No. 2004–G–2575, 2005-Ohio-4479, 2005 WL 2077319, ¶ 17, citing *Mosesson v. Rach,* 7th Dist. Mahoning No. 99 CA 321, 2001 WL 315236, , fn. 1 (Mar. 28, 2001). "In short, a court's equitable powers may be invoked to provide the flexibility necessary to moderate unjust results." *Id.* "Under the prayer for general equitable relief, the Court may grant any relief that is consistent with the pleadings and the evidence." (Citations omitted.) *Suburban Home Mortg. Co. v. Hopwood,* 83 Ohio App. 115, 123–24, 81 N.E.2d 387 (2d Dist.1948).

**{¶52}** "A deed of gift executed and acknowledged by one having legal capacity to convey, cannot be avoided *at law*, by proof that it was obtained by *undue influence*. The only remedy in such case is in equity." *Truman v. The Lesee of Thomas Lore*, et al, 14 Ohio St. 144 (1862), synopsis paragraph 2. We find, therefore, that the trial court did not err in invalidating the August 8, 2014 Transfer on Death Designation Affidavit

**{¶53}** Appellants also argue that there was no conclusion of law that Marjorie was susceptible to undue influence at the time she executed the August 8, 2014 Transfer on Death Designation Affidavit and no findings of fact to support a conclusion that any influence by appellant Thomas L. Corell was improper. We disagree.

**{¶54}** However, the trial court, in the January 10, 2017 Magistrate's Decision that waa approved and adopted by the trial court, specifically found that appellant Thomas L.

Corell "unquestionably exerted undue influence upon his wheelchair-bound mother, who was in her nineties and in declining health, when he compelled her to change her estate plan, which had remained consistent for a half-century."

**{¶55}** The elements of undue influence are: 1) a susceptible party; 2) another's opportunity to influence the susceptible party; 3) the actual or attempted imposition of improper influence; and 4) a result showing the effect of the improper influence. *Ingle v. Ingle,* Greene App. No.2005 CA 110, 2006–Ohio–3749, ¶ 51, citing *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962).

**{¶56}** In the case sub judice, the trial court found that Marjorie had remained consistent in her intentions regarding the property from 1963 through 2013 and had repeatedly indicated her desire to divide the property equally between her blood relatives. Since her husband's death in 1963, Marjorie had executed five estate planning documents; her 1963 Last Will and Testament, her 1993 Warranty Deed, the 1996 Quitclaim Deed, her 1996 Last Will and Testament, and that 2011 Transfer on Death Designation Affidavit. As noted by the trial court, the four latter documents were drafted by Attorney Cleaver with whom Marjorie had a trusting and long-standing relationship.

**{¶57}** However, in the latter part of 2011 appellant Thomas L. Corell moved into his mother Marjorie's home and obtained a $40,000.00 loan from her. He was living rent-free and Marjorie was paying the expenses for the farm while appellant Thomas L. Corell was keeping all of the profits. At trial, Appellant Thomas L. Corell admitted that, in 2011, his mother reaffirmed that she wanted the property to be in the family bloodline, equally divided and not 100% to him. Trial Transcript at 65. He further admitted that, at such point in time, she was becoming physically weak, was unable to care for herself, and was

having difficulty walking.     She required assistance from him and his sister Ruth.  He further conceded that the beginning of 2011, her physical health really started going downhill and declined until her death and that, in 2011, he and his wife borrowed $40,000.00 from her. Appellants executed a promissory note that had been prepared by appellant Sharron Corell. Under the terms of the note, they promised to make $500.00 a month payments plus 4% interest to repay the money. Appellant Thomas L. Corell admitted at trial that, during his deposition, he had falsely testified that his mother had not loaned him any money. He testified that he never paid any of the money back.

{¶58} The following is an excerpt from appellant Thomas L. Corell's testimony at trial:

{¶59} Q:  Right.  My question was before you moved in, there were no discussions of that [of him receiving 100% of the property and a Life Estate]; right?

{¶60} A:  No, that's not correct.  I lived within 500 of her or a thousand feet.  I would see her every day.  You know, we talk about - - I had asked her before about selling the farm to me even 20, 40 years ago.

{¶61} Q:  Selling the farm to you; right?

{¶62} A:  Yes.

{¶63} Q:  And she said no, I'm not doing that; right?

{¶64} A:  I don't want to do that right now.

{¶65} Q:  Right.  She wanted to leave it to you and your sisters; right?

{¶66} A:  According to the documentation, yes.

**{¶67}** Q:  But my question was before you moved in with her, your mom never discussed giving you one hundred percent interest in this farm or giving you a Life Estate; correct?

**{¶68}** A:  Yes.

**{¶69}** Q: "Yes" meaning I'm correct?

**{¶70}** A:  Yes.

**{¶71}** Q:  And you agree that you even told Sandra Cleaver when she indicated that your mom was willing to give you a Life Estate in 2014, you told Sandra Cleaver I don't want a Life Estate, that's not enough for me.

Didn't you tell her that?

**{¶72}** A:  Yes.

**{¶73}** Q:  I mean you made that very clear to Sandra Cleaver, your mom's lawyer, that you did not want that?

**{¶74}** A:  Yes.

**{¶75}** Q:  And just so we make the record clear, your mom used Sandra Cleaver as her lawyer all the way back into the 1990's; correct?

**{¶76}** A:  Yes.

**{¶77}** Q; And you mom always liked Sandy?

**{¶78}** A:  Yes.

**{¶79}** Q:  And Sandra Cleaver when your mom's health was declining, she would actually come out to the farm and meet with your mom; correct?

**{¶80}** A:  Yes.

**{¶81}** Q:  And did that on numerous occasions?

**{¶82}** A: Yes.

**{¶83}** Q:  And do you recall that when your mom and Sandra would end their meeting, your mom would actually give Sandra a kiss on the cheek?

**{¶84}** A: I don't know.  I wasn't in there.

**{¶85}** Q: So you didn't see that?

**{¶86}** A: No.

**{¶87}** Q: So you don't have any reason to deny that to be true?

**{¶88}** A: Yes.

**{¶89}** Q:  And when you had these discussions with Sandra Cleaver about not wanting the Life Estate, isn't it true that you were saying no, I should get one hundred percent of the farm because of my blood and sweat?

**{¶90}** A: No.

**{¶91}** Q: You didn't say to Sandra that you should get a hundred percent of the farm because of your blood and sweat?

**{¶92}** A: I said that, yes.

**{¶93}** Q: Okay.  And those were your words?

**{¶94}** A: Yes.

**{¶95}** Q: Not your mom's words?

**{¶96}** A: No.  She said that also.

**{¶97}** Q: Well, when I asked you in your deposition - - turn to page 114.  This is the next page over.

Okay.  On the question on line 4 I said, " Now do you ever remember saying to your mom or saying in the presence of your mom in front of Ruth and Renee that

because of the blood and sweat that you put into the farm you deserved more of an ownership interest than them?" Your answer: "Yes, I made that comment."

Question: "I mean those are your words, right?" "Yes."

Question: "The 'blood and sweat' are your words, right?" "Yes."

Is that right?

**{¶98}** A: Yes.

**{¶99}** Q: So those were your words?

**{¶100}** A: Yes.

**{¶101}** Q: Not your mom's?

**{¶102}** A: Yes.

**{¶103}** Trial Transcript at 75-78.

**{¶104}** He further testified that he did not want life estate in the property, but wanted it all and that, after getting the life estate, he spoke with Attorney Cleaver or his mother about getting 100% of the farm. He testified that his mother told Attorney Cleaver over the phone that she wanted to give him 100% of the farm. There was testimony that Marjorie signed a Transfer on Death Affidavit in May of 2014 indicating that she wanted appellant Thomas to receive 100% of the farm, but that Attorney Cleaver did not record the same because Marjorie told her that she did not want to give him 100% of the farm, so she gave him a life estate instead.

**{¶105}** At the trial, the deposition of Attorney Cleaver was admitted as an exhibit. During her deposition, she testified that when she spoke with Marjorie after appellant Thomas L. Corell called her and told her that Marjorie wanted to change the will and leave everything to him, she sensed that Marjorie suffered from anxiety. She was

concerned that Marjorie might be under pressure and testified that Marjorie had told her that he had pressured her to give the farm to him. The following is an excerpt from the deposition testimony:

**{¶106}**       Q:  And did she ever at any point tell you, jeez, I think I'm going to change my mind and give it to Tom outright because that's what I want to do?

**{¶107}**       A:  No she never said that.

MR. ZIMMERMAN:  Okay.  I have nothing further, thank you.

RECROSS-EXAMINATION

BY MR. MILLER:

**{¶108}**       Q:  Recross.  Sandy, you used the word "pressure" in answer to Mr. Zimmerman's questions and you said it on two or three occasions that Marjorie told you that Tom pressured her to give the farm to him.  I want you to tell me specifically what things Marjorie told you Tom did that constituted pressure.

**{¶109}**       A:  She said he constantly was at her to do this change to him and only him.

**{¶110}**       Q:  And what do you mean by the words "at her"?

**{¶111}**       A:  Always like harassment, almost, I felt it was.

**{¶112}**       Q:  No, I'm not asking what you felt it was.

**{¶113}**       A:  Oh, all right.

**{¶114}**       Q:  I'm asking what she told you.

**{¶115}**       A:  I can't remember her exact words.  But she said Tom wants it this way.

**{¶116}**        Q:  What did she tell you how Tom expressed his desire to have the farm?

**{¶117}**        A:  At one point she said he was angry at her.

**{¶118}**        Q:  Did you ever see him be angry with her?

**{¶119}**        A:  Not to my recollection.

**{¶120}**        Q:  Okay.  What else, If anything, did she tell you constituted pressure by Tom?

**{¶121}**        A:  I'm trying to think.  Sorry. Just for a minute.  I can't recall exactly.

**{¶122}**        Q:  Can you recall generally?

**{¶123}**        A:  Generally I can.  Yes.

**{¶124}**        Q:  Okay.  Tell me generally.

**{¶125}**        A:  Generally she said that he was wanting her to make the change and she felt upset.  She didn't know whether she was doing the right thing if she changed it to him and she just was always calling me urgently, please come and let me talk to you about this.  She would be upset.

**{¶126}**        Deposition of Sandra Watkins Cleaver at 82-83.

**{¶127}**        The life estate was signed the end of June of 2014 when Marjorie was almost 97 years old.  However, appellant Thomas did not want a life estate and, therefore, called his own attorney, Mark Percival, who Marjorie had never met, and scheduled an appointment for his mother to meet with him. At the time, Marjorie was getting around in a wheelchair. Appellant Thomas L. Corell admitted that he drove his mother to Attorney Percival's office and assisted her into the office without the benefit of her wheelchair.  Attorney Percival later discovered that approximately one month prior,

Marjorie had executed a Quitclaim Deed transferring a life estate in the property to appellant Thomas. He testified that he was unaware that appellant Thomas and his wife had borrowed $40,000.00 from Marjorie in 2011 and that, in May of 2014, appellant Sharon Corell wrote up a statement whereby Marjorie would agree to waive repayment of such money. He also testified that he was not aware that appellants were living at Marjorie's house rent free and that Marjorie was paying living expenses for the farm or that appellant Thomas was keeping all of the profits from the farm. He testified if he had been aware, he would have asked more questions. The following is an excerpt from Attorney Percival's deposition testimony that was admitted as an exhibit at trial:

{¶128} Q: And you would agree with me when you saw that a month after a 97-year-old woman transfers a Life Estate to her son, and within a month that same 97-year-old woman is coming to see you, not Sandra Cleaver but you, to give Tom Corell a hundred percent of the farm, you would agree with me that raised a red flag for you?

{¶129} A: That raises a red flag. I also know that a month before a Transfer on Death Designation had been done by the same attorney.

{¶130} Q: Right, and that caused you concern too, didn't it?

{¶131} A: In the totality, yes.

{¶132} Q: I mean you would agree with me that Sandra Cleaver had prepared a document that was similar that you were going to prepare for Marjorie Corell to sign; right?

{¶133} A: That's correct.

{¶134} Q: So you would have assumed that Marjorie Corell would have paid Sandra Cleaver for that service; right?

**{¶135}**     A:  Yeah.

**{¶136}**     Q:  And then you asked her, Well, why wasn't this recorded; right?

**{¶137}**     A:  I did ask her if she knew.

**{¶138}**     Q:  And she couldn't explain to you why it wasn't recorded, could she?

**{¶139}**     A:  I did not have what I thought was a clear answer, no.

**{¶140}**     Q:  Right, you did not have a clear answer because she could not provide you a clear answer?

**{¶141}**     A:  Apparently, yeah.

**{¶142}**     Q:  Certainly as an attorney knowing that, that had to have caused a red flag to also go up; correct?

**{¶143}**     A:  And I was still asking her questions about what she was doing.

**{¶144}**     Q:  But you didn't get a clear answer of why it wasn't recorded.  You assumed Marjorie Corell paid for that service but you can't figure out why it hasn't been recorded; right?

**{¶145}**     A:  No, I did not know.

**{¶146}**     Deposition of Mark Percival at 125-126.

**{¶147}**     Attorney Percival prepared a Transfer on Death Designation Affidavit that transferred a 100% ownership interest in the property to appellant Thomas on Marjorie's death. On August 8, 2014, appellant Thomas again drove his mother to Attorney Percival's office and walked her into the office where she executed the Affidavit. Attorney Percival, at trial, admitted that her signature on the document was shaky and unsteady and unlike her previous clear signatures. Appellant Thomas L. Corell, at trial,

also testified that her signature was" shaky" and "unsteady" as compared with her signature on previous documents. Trial Transcript at 100. Appellants paid Attorney Percival for the services that he performed for Marjorie.

{¶148}        At trial, appellant Thomas admitted that he kept the meetings with Attorney Percival and the resulting Transfer on Death Designation Affidavit a secret from appellees and never invited his sister Ruth to go to the Attorney's Office. He further agreed that he and Ruth had taken their mother together to Attorney Cleaver's office in April of 2014. He also admitted that he never shared with Attorney Percival, his private attorney, that for the past 50 years, his mother had steadfastly wanted the property to be equally divided between her blood relatives upon her death. He also testified that his mother told him to keep the fact that she wanted him to have the farm a secret and that, even after his mother died, he did not share what his mother had done and chose to keep it a secret. When asked why he kept it a secret after her death, he indicated that he did not do anything wrong, but was afraid that once his family learned that he had obtained complete ownership of the property, he would end up in court proceedings.

{¶149}        Moreover, there also was testimony at trial that appellant Thomas L. Corell had approached his sister, Ruth and his niece, Renee, and offered to purchase their respective shares of the subject property for $20,000.00 each. He admitted having an appraisal saying that the farm was worth $300,000.00, but indicated that he felt his offer, which was declined, was fair. It was after such refusal that he contacted Attorney Cleaver about getting 100% of the property.

{¶150}        We find, based on the foregoing, that the trial court did not err in invalidating the August 2014 Transfer on Death Designation Affidavit on equity grounds

based on evidence of undue influence by appellant Thomas L. Corell. The trial court's finding that Marjorie was subject to undue influence was supported by the record.

{¶151}    Appellants' third and fourth assignments of error are, therefore, overruled.

V

{¶152}    Appellants, in their fifth assignment of error, argue that the trial court erred in taxing costs against appellant Sharron Corell.  We disagree.

{¶153}    The Ohio Supreme Court, in *Williamson v. Ameritech Corp.* , 81 Ohio St.3d 342, 343, 1998-Ohio-625, 691 N.E.2d 288 stated as follows with respect to the allowance of costs in a civil case: "Civ.R. 54(D) provides the general rule allowing costs to the prevailing party in a civil case unless the court otherwise directs." The assessment of costs which are authorized by law is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Taylor v. McCullough Hyde Memorial Hosp.*, 116 Ohio App.3d 595, 600, 688 N.E.2d 1078(12th Dist. 1996). In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶154}    As noted by appellees, Sharron Corell was a named defendant in this case and obtained a dowership interest in the subject property when it was transferred to her husband upon Marjorie's death. The evidence showed that she assisted her husband in his efforts to acquire 100% ownership of the property, paid Attorney Percival for his services and prepared the language to cancel the $40,000.00 loan that she and her husband had with Marjorie.

**{¶155}** Based on the foregoing, we find that the trial court's decision to assess costs against her along with her husband was not arbitrary, unconscionable or unreasonable and that the trial court did nor abuse its discretion. The trial court's decision was not arbitrary, unconscionable or unreasonable.

**{¶156}** Appellants' fifth assignment of error is, therefore, overruled.

**{¶157}** Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed in part and reversed in part.

By: Baldwin, J.

Delaney, J. concur

Hoffman, P.J. separately concurs
in part and dissents in part.

*Hoffman, P.J., concurring in part and dissenting in part*

{¶158}  I concur in the majority's analysis and disposition of Appellant's first, third, fourth and fifth assignments of error.

{¶159}  I respectfully dissent from the majority's decision to sustain Appellant's second assignment of error regarding attorney fees.  As noted by the majority, an "award of attorney fees is authorized in situations when punitive damages would be appropriate, *i.e.* the conduct is so egregious as to constitute fraud, malice, bad faith or wantonness." (Majority Opinion at ¶44, citing *Columbus Finance v. Howard*, 42 Ohio St.2d. 173, 327 N.E. 2d. 654 (1975), et. al.).

{¶160}  Although we determined in our discussion of Appellant's first assignment of error, punitive damages are not legally recoverable in the absence of a compensatory damage award, the question of whether punitive damages are "appropriate" and "warranted" based upon Appellant's conduct is a different matter.

{¶161}  I would find under the unique facts presented in this case, punitive damages are both warranted and appropriate, thereby, support an award of attorney fees despite the fact the punitive damage award itself was legally prohibited.  The fact the trial court elected to impose the equitable remedy of declaring the August, 2014 Transfer on Death Designation invalid in lieu of ordering a compensatory damage award as the best way to achieve justice in this matter and preserve the decedent's clear expressed intent to keep the property in the family bloodline, does not bar its discretion to award attorney fees because punitive damages were otherwise both warranted and appropriate.