[Cite as *Handy v. Patriot Mgt. & Invest. Co.*, 2026-Ohio-1627.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

BEULAH M. HANDY,                          :

    Plaintiff-Appellee,            : CASE NO. 24CA11

    v.                             :

PATRIOT MANAGEMENT &                      :
INVESTMENTS COMPANY, ET AL.,       DECISION AND JUDGMENT ENTRY
                                          :
    Defendants-Appellants.

_____

APPEARANCES:

J. Randall Engwert and Jorden R. Messmer, Toledo, Ohio, and Melvin
Davis, Columbus, Ohio, for appellants.

Donald R. Capper, Proctorville, Ohio, and William M. Mundy,
Huntington, West Virginia, for appellee.
_____
CIVIL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:5-1-26
ABELE, J.

{¶1} This is an appeal from a Lawrence County Common Pleas
Court judgment that denied defendant, Heartland-Riverview of South
Point, Oh, LLC, motion to stay the proceedings pending arbitration.
Heartland, defendant below and appellant herein, raises one
assignment of error for review:

> "THE TRIAL COURT ERRED WHEN IT DENIED
> DEFENDANT-APPELLANT'S MOTION TO STAY THIS CASE
> PENDING ARBITRATION."

{¶2} Appellee Beulah Handy needed skilled rehabilitation after a 2021 total knee replacement surgery. Appellee later filed suit and alleged that Heartland's negligence in failing to provide an appropriate wheelchair for her June 1, 2021 transport from their facility to a medical appointment caused appellee to fall and suffer serious physical injuries. Heartland, however, contends that appellee agreed to arbitration, which is the subject of this dispute.

{¶3} On June 1, 2022, appellee filed a medical negligence claim in the Lawrence County Common Pleas Court against appellant, who formerly did business as the nursing home known as ProMedica Skilled Nursing and Rehabilitation, and the co-defendant Patriot Management and Investments Company (Patriot). Patriot is not a party to this appeal.

{¶4} Appellee's complaint alleged:

1. On or about June 1, 2021 the plaintiff was an inpatient receiving nursing and rehabilitation services from the defendants, Heartland of Riverview of South Point, OH LLC and Promedica Skilled Nursing and Rehabilitation. . .

2. Plaintiff, Beulah M. Handy is a resident of Lawrence County, Ohio.

3. Plaintiff was to be transported from the Heartland facility to a physician's office . . . and to be returned to Heartland after her doctor's appointment.

4. Due to plaintiff's medical and physical condition, she needed ambulatory transport to her medical doctor's appointment.

5. Arrangements for transport were made solely by Heartland

who chose Patriot EMS for transport.

6. At all material times Heartland was the agent for Patriot and are vicariously liable to the acts of Patriot.

7. Patriot elected to use a defective and ill-equipped wheelchair that belonged to Heartland to transport the plaintiff from the nursing facility to the ambulance . . .

8. The Patriot EMS employee along with an agent and employee of Heartland moved the plaintiff via wheelchair from the nursing facility to the waiting ambulance and because of the defective condition of the wheelchair, and their negligence in transporting the plaintiff, caused the plaintiff to be thrown from the wheelchair fracturing her leg.

9. Both the Patriot and Heartland employees were negligent in not ensuring the wheelchair selected was appropriate for the plaintiff and by not appropriately conducting the transport and making sure the plaintiff's legs were secure in the wheelchair.

10. Heartland was negligent in maintaining equipment that was inappropriate for transporting the plaintiff and for not training its staff how to safely transport a patient that was in the medical condition which the plaintiff presented.

11. Patriot was negligent in failing to train its staff in proper transport of patients and to use appropriate medical equipment and for failure to use an appropriate wheelchair to transport the plaintiff which failure caused the plaintiff to be thrown from the wheelchair causing serious physical injuries.

12. As a result of the negligence of Heartland and Patriot the plaintiff received serious physical injuries which required, but was not limited to, multiple surgical repairs of the plaintiff's leg.

13. Plaintiff has incurred medical expenses due to defendants' negligence, endured pain and suffering, emotional distress, lost enjoyment of life and other damages.

14. Plaintiff has serious permanent injuries which will

cause the plaintiff to incur future medical expenses, endure future pain and suffering, lost enjoyment of life and other damages.

{¶5} On July 5, 2022, defendants Heartland-Riverview of South Point, OH, LLC (Heartland) and ProMedica Skilled Nursing and Rehabilitation (ProMedica) filed an answer and admitted appellee received care in their facility, but denied all other allegations. On July 20, 2022, defendants Heartland and ProMedica filed a Civ.R. 10(D) motion for judgment on the pleadings, and, on September 12, 2022, defendants filed a motion to stay discovery. Relevant to the case sub judice, on November 16, 2022 Heartland and ProMedica filed a motion to stay proceedings pending arbitration. On December 20, 2022, appellee filed a response to defendant's motion to stay proceedings pending arbitration and argued (1) no contract to arbitrate exists, and (2) any such contract, if it so exists, would be a contract of adhesion.

{¶6} On May 11, 2023, the trial court denied the motion for judgment on the pleadings and motion to stay discovery. The court held in abeyance the motion to stay proceedings pending arbitration because a dispute exists regarding the enforceability of the agreement and whether appellee signed the agreement. Thus, the court held Heartland's motion in abeyance and ordered the parties to conduct discovery and brief the issues concerning the arbitration agreement.

{¶7}  At David Roush's December 8, 2022 video-taped deposition, Roush stated that he is an EMT, worked for Patriot EMS, transported "probably over a thousand-some calls," and received transport training from Patriot: "You're basically with the person who had been there working for the company with experience in wheelchair, and you go with them and they show you how to operate the wheelchair, how to load it up, and all the training that you need to transport the wheelchair unit."  Roush said he received four days of training on the truck and "they had, like, two, three videos that you watched for transports."  Roush added that he completed competency testing on the material.

{¶8}  Roush did remember transporting appellee, but reviewed the run report to prepare for his deposition.  Roush drove a van that day and knew he would transport appellee by wheelchair, although the transport van did not carry a wheelchair.  When they arrive at a facility, the nursing staff would usually place the patient in a wheelchair and, because wheelchairs do not contain seat belts or restraints, Roush would use a belt to secure the wheelchair.

{¶9}  On June 1, 2021, Roush received a 1:20 p.m. dispatch for a 1:00 p.m. pick up for appellee's 2:00 p.m. medical appointment. The run sheet stated that Roush was at Heartland for four minutes, but Roush said that was incorrect.  Roush stated that when he arrived, he also received appellee's paperwork that they take with

the patient to the medical appointment.  Roush did notice:

> [t]he wheelchair that she's in is, like, a little too big
> to go in the truck that I had.  So they switch her out into
> a smaller chair, which both wheelchairs didn't have foot
> pegs [footrests] on either one of them.
>
> I asked - when they switched her into the other one, I
> asked them if they had footrests for the one, and just
> 'cause I feel comfortable with the foot pegs on.  But they
> said they didn't have foot pegs, saying that she was able
> to hold her legs up, that she had no problems with it.
>
> So we go to transport, start taking her out the building,
> like, walking in with both hands on the handles, taking
> her down the hallway slow.  We go out the doorway to get
> into the truck, which make sure there's nothing - - no
> obstacles or anything blocking anything.
>
> As we're walking down the aisle to go to the truck - -
> which is flat land, ain't no hills there or nothing, it's
> just all flat.  She says she's slipping a little bit.  So
> both hands on the wheel, we slowed the wheelchair down a
> little bit more. . .
>
> I slowed the chair down a little bit even more so - - and
> right in, like, halfway down the aisle thing on the
> sidewalk, she slides out real slowly and goes on the
> ground.  Which, like, the wheelchair's not very far off
> the ground in the first place.  So I mean, she didn't slip
> that far out of the wheelchair.

{¶10} When asked if he observed appellee fall out of the

wheelchair, Roush said:

> I mean, I didn't actually see her slip out of the thing.
> She said she was slipping.  So when I was slowing the
> wheelchair down, then, next thing, she's, like, laying on
> the ground.
>
> Then the nurse's aides and stuff that were outside came
> over and checked her, checked her side, and make sure she
> was all right.  She said she was fine, that she didn't have
> no pain at that time.  And they went in and got the blood
> pressure machine and stuff, checked her blood pressure,

pulse, all that, made sure she was good.

Nurse's aides that were out there said she was fine to be transported to the hospital or her doctor's appointment. Put her back in her chair, made sure she was able to hold her feet up, she was.

{¶11} Roush stated that a "nurse's aide outside" placed appellee in the wheelchair. After the incident, appellee held her feet up "and didn't drag them at all," while he transported her to her doctor's office. Also, appellee did not complain of pain. At the time of the accident, Roush did not know that appellee had recently undergone a total knee replacement.

{¶12} Even though medical records stated, "her cheek is red from the concrete," and documented bruising on appellee's face, Roush stated that he did not see how she could have injured her face and "I didn't see no red and bruised checks (sic.) on her." Roush said appellee was "laying on her left side" on the sidewalk. When medical staff asked appellee what happened, appellee said she slid out of the chair.

{¶13} The nursing record from appellee's Heartland medical file states, "took a statement from the ambulance driver." Roush, however, denied that he gave a statement to anyone at Heartland. Roush stated that he sent an email to "Jess" at Patriot, which he reviewed:

> Went to Heartland to pick up a patient yesterday to take to Huntington for appointment. Was pushing her to the van talking on the way, then heard, "Help." Looked down, and

she was on the ground. They came out to check her BP, blood pressure, and stuff. Asked her if she was okay, and she told them that she had a little pain in her face and arm but she was okay.  Nurse said she may have got her foot caught in the crack of the sidewalk and pushed her forward in the chair.

{¶14} At Amber Rivera's April 17, 2024 videotaped deposition, Rivera stated that she worked at Heartland since 2015 and currently is a social worker.  In May 2021 Rivera worked as an admissions assistant.  While some wheelchairs are equipped with footrests, Rivera did not know who determined which patients used which wheelchairs.  Rivera did not recall her interactions with appellee and did not observe appellee's June 1, 2021 injury.

{¶15} Typically, staff completes admissions paperwork within 24 hours after a patient arrives.  In Rivera's training, Heartland instructed her to review the contract with the patient, answer questions, and explain the arbitration agreement.  Rivera stated that the arbitration agreement "is voluntary, it is not necessary for them to sign.  Their condition -or their admission to the facility is not contingent upon them actually signing this." Rivera explained that she would read the Introduction to Our Voluntary Arbitration Program to the patient, but not read "the entire agreement," and instead read the bullet points in the agreement, "pretty much verbatim."

{¶16} With respect to appellee, Rivera said the arbitration agreement could have been a paper contract, or could have been

completed through an iPad if they used them at that time, which she could not recall.  When asked if appellee signed the agreement on an iPad, Rivera replied, "[I]t could have been, but I don't believe hers was, but I honestly can't recall."  Rivera explained that when a patient signs an iPad "it can be a little difficult to write with your finger, so the signature may not look as it would if it was written with a pen."

**{¶17}** When asked if she told patients that the arbitration agreement meant that the patient waived their right to a jury trial, Rivera stated, "No, I don't believe so.  I mean the way that it's worded in here, it does say that they will forego or they may forego, you know, using arbitrator instead of a judge and jury.  So I mean technically I guess, yes, I may say that because I am reading the bulletin (sic) points, but it's not verbiage that I would use and it's not a side conversation that I would have."  When asked if she understood punitive damages or the right to recover attorney fees, Rivera said, "I don't know that."  In addition, when asked if a patient can appeal an arbitrator's decision, Rivera replied, "I honestly don't know."  Rivera told patients that "it is voluntary, they don't have to sign it, and if they chose to rescind the arbitration that they could do so within 30 days in writing."

**{¶18}** Although Rivera could not recall or attest directly regarding appellee, she stated that if she observed cognition

issues or believed a patient "confused in any way," or incapable of completing this on their own, she would have "reached out to somebody else, but being that she did sign it, you know, with me together that I wouldn't have had her sign it if I had questions on her cognition or ability to understand any of this." "If there was a question to cognition, if a patient exhibited signs that they were not their own person, if there was any reason to suspect they were maybe confused, disoriented, maybe recovering from a surgery, altered mental status," she "would have looked at the record to see if there was anything existing and then to find a contact to reach out to to complete this . . . on her behalf." She conceded, however, that no way exists to determine exactly what occurred with respect to appellee.

**{¶19}** Tom Kelley stated at his April 17, 2024 videotaped deposition that he is an administrator with Legacy Health Services, a nursing home operating company. At the time of the accident, Heartland owned the facility and the facility had, and still has, a contract with Patriot for ambulance service. Kelley did not observe the accident. When Kelley arrived at Heartland, staff told him, "she just fell out of the chair." Kelley elaborated, "I asked did they hit something on the sidewalk, was there an uneven place in the sidewalk, was there a rock or something on the sidewalk, and they said no, she just fell forward out of the chair."

{¶20} Kelley described the wheelchair in question as "a standard wheelchair," and he did not believe it had footrests. Most Heartland residents use wheelchairs to ambulate about the facility and do not need footrests. Most of Heartland's wheelchairs do not have footrests, but footrests are available if needed. Kelley was unaware of how or who determined what type of wheelchair to use to transport appellee.

{¶21} At appellee's April 26, 2024 oral deposition, she explained that, after she underwent total knee replacement surgery, the hospital discharged her to her home. However, she became dehydrated and needed to be readmitted. After that, she "needed to go to a facility for rehab, so I picked Heartland." Appellee recalled her 2021 gurney transport to Heartland and said, "[t]hey would not let my daughter go. She was never allowed in my room there. No, no one."

{¶22} Appellee described her general condition at Heartland as, confused, "but I don't think I knew I was confused. . . It was just different there. It was - I remember I asked to speak to the doctor and I wanted to know what medication they had me on, but I didn't get to speak to him until probably three or four days later." Appellee stated that the hospital knew she was confused and checked on her often, but "at Heartland no one checked. They brought your pills in and brought your lunch."

{¶23} When asked if she recalled signing paperwork upon her arrival at Heartland, appellee replied, "no." When asked if she recalled anyone at Heartland going over paperwork with her, appellee replied, "They didn't." She explained, "I wasn't – – I wasn't right. I didn't feel – – I didn't feel normal." When asked if the signature on the "Signature of Patient or Responsible Party," was hers, appellant replied, "I don't know. It doesn't – – it doesn't look like it, and I don't remember signing it, so I would have to say no." When asked if someone else signed her signature, appellee replied, "I didn't see anyone sign it, but I didn't sign it, so someone had to." Appellee added that the date did not look like her handwriting either, "because I don't make my letters that way, my numbers."

{¶24} When again asked if the Arbitration Agreement signature is hers, appellee said, "No. And all three of these signatures are different that you have showed me today. . . [t]hey don't look like my handwriting." When asked if she took any medication that would affect her memory or ability to understand, appellee replied, "no." Appellee also said that she had a wheelchair in her room, and her physical therapist would take her to physical therapy in the wheelchair. When asked if she used footrests on wheelchairs at Heartland, appellee stated, "I don't remember."

{¶25} Turning to the date of the incident, appellee said that "the girl that works at Heartland" put her in the wheelchair in her

room and:

> took me outside and that's where the guy was waiting.  And either he was late or they were late getting me out there, but my appointment was at 2:00, so - - and it was almost 2:00 I think when I got out there.  And he was fussing that he had to be in Ironton at 5:00 and he was going to be late.
>
> And then he had ear buds or something in his ears and he told me, he said, "We're going to go fast because I'm in a hurry."  And he started pushing that wheelchair really fast and I was yelling for him to stop, and I screamed, I remember I screamed, and he didn't hear me, he didn't stop, and then I was just pitched right out on the concrete."
>
> I remember laying on the sidewalk and I was bleeding and then there was an LPN there, I don't know her name, and she said, "You've got to turn over so we can get you up." And I said, "I can't.  My leg hurts. I can't move my leg." Well, my leg was broken and they had to put a plate in it, so that's - - at the hospital I found that out. That's why I couldn't move my leg."
>
> My leg was throbbing because they had also broken my new kneecap, my new artificial knee, plus my leg.  I was in a lot of pain and my head hurt because my head hit the concrete.

{¶26} At Jodie Barker's April 26, 2024 oral deposition, Barker explained that she is appellee's daughter.  After appellee's May 18, 2021 knee replacement, appellee went home, but later developed a urinary tract infection, became dehydrated and "very weak and went back to Cabell [the hospital]."  At home, prior to being hospitalized for the infection, appellee "would tell me off-the wall-things that were not correct."  In addition, appellee fell a few times, "she would just slide out of her bed.  She thought she could walk. . . because of the hallucinations."

{¶27} At the hospital, Barker spoke with medical staff about her mother's cognitive issues and the staff recommended a rehabilitation facility.  Barker said that medical staff "told me a UTI can cause them to have some cognitive brain fog."  Later, when the hospital transferred appellee to Heartland, "[s]he wasn't really in her - - I don't feel my mom was a hundred percent at that time. . . . her memory from the infection, she was very weak, she wasn't understanding things that she normally does. . . I just remember I would have to explain things a few times to her. . . It took a very long process to get her to understand."

{¶28} At the time of her mother's transfer to Heartland, Heartland did not permit Barker to enter the facility "because they were not letting visitors in" due to COVID restrictions.  Heartland permitted Barker one visit and, when Barker visited, "[s]he did not seem like my Mom.  She - - something was off. . . [s]he was very agitated."  Barker "did not get much information from her because she was not a hundred percent.  She wasn't like Mom."  When Barker visited with her mother, someone from the facility brought her to the room in a wheelchair with footrests.

{¶29} On the day of the accident, Barker waited for her mother at her mother's doctor's office because she did not have permission to travel with her.  At some point, "someone from Heartland called me and told me my mom had a little accident and was running late."  After the fall, appellee called Barker and said, "Call an

ambulance. I'm on the floor bleeding." When appellee arrived at the hospital, she told Barker "that she was dumped out of the wheelchair."

{¶30} At Krista Ellison's May 30, 2024 oral deposition, Ellison, a co-owner of Patriot EMS, spoke with David Roush, Tom Kelley, and appellee's daughter about the accident and testified that the facility selects the wheelchair for patient transport. After speaking with Kelley, Patriot employee Roush, and appellee's daughter, Ellison concluded, "Ms. Handy could not hold her feet up and her feet got hung under the wheelchair, which would cause her to come out of the wheelchair." In addition, Ellison recalled that Kelley told her "there was an incident that had occurred and that . . . Ms. Handy had an incident outside the nursing home, she couldn't hold her feet up. I don't know if he said she couldn't hold her feet up. He just said that they believe - - there was a nurse outside that witnessed the whole thing, so they believe that she could not hold her feet up, her foot got hung under the wheelchair and that she came out of the chair."

{¶31} When asked if David Roush had been "running late" for appellee's transport, Ellison stated, "running late in our profession is [the] norm. I'm just being honest with you." Although the "run sheet" reflected that Roush was late, Ellison testified, "we had a lot of issues with the system that we was using at the time. . . I don't think they're accurate, no."

Ellison stated that Roush would not have been aware that appellee had a recent knee surgery.

{¶32} Additionally, the June 2, 2021 management incident investigation report from the CEO of Patriot states:

> After discussions with the Administrator at Heartland and the daughter of Beulah Handy, we know that Ms. Handy could not hold her feet up during transfer (riding) in the wheelchair. Mr Roush was pushing Beulah to the wheelchair van when her feet got hung up under the wheelchair causing her to fall forward. Nursing staff was outside when this happened. They rushed over and checked Beulah out. Nursing staff and the patient stated she was fine. Patient stated she wanted to go on to her Dr. Appointment, so that's what Mr. Roush did. The next day is when I (Krista Ellison) received a phone call from the Administrator and the patient's daughter stating Beulah was injured. I was told Beulah had a previous injury to the leg she was claiming was injured during this fall.
>
> Recommendation Plan if appropriate: Mandatory Education and training with staff on proper safety restraints for wheelchair patients and educational talks with Heartland over medical necessity and which patients can go by wheelchair van. The majority of wheelchairs from nursing homes do not have leg rests on them. Patriot EMS does not dictate how the patients go out. Heartland tells our Dispatch either wheelchair van or cot.

{¶33} At the May 22, 2024 videoconferencing deposition of Anthony J. McEldowney, M.D., McEldowney explained that he treated appellee on July 13, 2021 to irrigate and debride tissue due to a patellar tendon injury. McEldowney opined that the July 13 procedure was related to appellee's June 1, 2021 fall. Appellee told McEldowney that she sustained a fall forward in a wheelchair being transferred for a postoperative appointment to an orthopedic

specialist.  McEldowney read from his notes: [Appellee] said, "On June 1, 2021, I was tossed out of a wheelchair by a contracted transport service at Heartland Nursing Home.  They placed me in a wheelchair with no foot rests and the transport driver was rushing."  McEldowney opined that "if it were my patient and my patient were transferred to a rehabilitation facility, I would say that you have to provide all precautions, including seat belts, for that patient the first few weeks because these things do unfortunately happen.. . a foot rest should have been there.  And she should have even had a seat belt on during that time."  McEldowney conceded, however, that he was unaware of peer-reviewed literature that requires foot rests and seat belts on wheelchairs, but noted that the Cleveland Clinic trained him that way.

**{¶34}** On May 30, 2024 the trial court held a hearing on the motion to stay pending arbitration.  Handwriting expert Vickie Willard testified on behalf of Heartland that all of the signatures on the admissions paperwork were those of "the same writer," "all written by one individual."

**{¶35}** Appellee testified at the same hearing that she has the following diagnoses: (1) hypertension, (2) gastroesophageal reflux disease, (3)gout, (4) malignant neoplasm in one or both breasts, and (5) muscle atrophy.  However, appellee had not been diagnosed with any mental or cognitive disorders at the time of the incident, and was not under the treatment of a psychiatrist or psychologist

in May 2021, but hospital staff prescribed an antidepressant.

**{¶36}** Appellee believed that she had been given medication the night she arrived at Heartland, but did not know which medication. Heartland did not permit appellee's daughter in her room and she could only see her once briefly in a different room for a few minutes [due to COVID restrictions]. When asked if she disputed the signature on the arbitration agreement, appellee replied, "Yeah, I don't remember signing anything." When asked whether anyone at Heartland talked to her about an arbitration agreement, appellee replied, "No, and I didn't know what arbitration was." When asked if anyone asked her to sign any documents while at Heartland, appellee replied, "No." When asked if she knew Amber Rivera, appellee said, "No." When asked if Amber Rivera spoke with her about any documents, appellee replied, "No." Appellee stated that when she arrived at Heartland, she was "scared. . . [n]othing was clear. It was - - it was like everything was uh, was in a fog. I - - I just remember going down this dark hall on that gurney, and I was scared." When asked if she was taking pain medications, she replied, "definitely," and appellee later asked staff at Heartland not to prescribe this heavy pain medication "because . . . I said I don't feel right."

**{¶37}** Jodi Barker, appellee's daughter, testified at the May 30, 2024 hearing that when her mother stayed at Heartland from May 27, 2021 to June 1, 2021, Barker could not enter her mother's room

and could only visit with her one time.  Barker did not sign any documents on her mother's behalf at Heartland.  Barker agreed that her mother had not been diagnosed with Alzheimer's or dementia, but stated that when her mother left the hospital to go to Heartland, "[s]he was confused.  She was confused the whole time she was in the hospital. . . she would mumble a lot and then she would take her blankets and tell me she was knitting.  I later learned that the infection in older people works that way to cause confusion."  Barker said her mother had received a low dose of an unknown pain medicine, and Barker did not believe her mother "was herself mentally" when the hospital transferred her to Heartland.  When Barker saw her mother at Heartland, "[s]he didn't seem like she was herself.  She just didn't seem like my mom always seemed . . . she was still very weak.  Said things that I would look at her and question, and then she would get agitated because I wasn't understanding what she was trying to tell me.  She would say things that - - out of her mind a little bit."

{¶38} Barker spoke to appellee on the evening of May 28 when the hospital transferred appellee to Heartland.  "She didn't want to talk long.  I had just called to make sure she made it okay.  She still was not clearly in her right mind."  Barker stated that at the time of the incident, her mother was 72 years old.  No one discussed an arbitration agreement with Barker.

**{¶39}** Appellee's Exhibit 1 from the May 30, 2024 hearing showed a mostly blank 27-page medical record entitled, "Minimum Data Set (MDS) Version 3.0 Resident Assessment and Care Screening Nursing Home Discharge (ND) Item set."  Only page 27 had been completed with signatures, titles and dates that staff providing dietary, social services, speech therapy, and RN services from June 2, 2021 to June 15, 2021.

**{¶40}** Appellee's Exhibit 2, Heartland History and Physical medical form, is a May 29, 2021 document completed by David Apgar, D.O., under "History of Present Illness."  The document noted that, while at the hospital, appellee "was taking oxycodone and it was causing her to feel confused of hallucinations and experience nausea and vomiting."  It documents that appellee "does not want pain medication during the night."  Diagnoses include: (1) Left knee pain due to osteoarthritis, (2) tachycardia, (3) presence of left artificial knee joint, (4) muscle wasting and atrophy, (5) post-procedural kidney failure, (6) essential primary hypertension, (7) obesity, (8) gout, (9) history of treated cancer of the breast in 2009, (10) GERD, (11) depressive disorder, and (12) edema of the lower extremities.  Under "plan," the document included: "Norco 5/325 mg will be given q.i.d. and an extra half tablet will be given prior to therapy."

**{¶41}** Appellee's Exhibit 5, a Resident Controlled Substance Record, reflects that on May 27, 2021 and May 28, 2021 at 9 p.m.,

appellee received (1) 10 mg of zolpidem (Ambien, a sedative-hypnotic medication for insomnia), (2) 5/325 mg of hydrocodone-acetaminophen on May 29 at 9:30 a.m., 1:00 p.m., 4:00 p.m., and 8:00 p.m., (3) 5/325 mg tablets of Norco (combination of opioid pain reliever hydrocodone with the analgesic acetaminophen) on May 27 at 9:00 p.m., on May 28, 2021 at 2:45 p.m., May 30 at 8:00 a.m., 12:00 p.m., 4:00 p.m., and 8:00 p.m., May 31 at 8:00 a.m. and 12:00 p.m., and on June 1, 2021 at 12 p.m.  In addition, defendants Riverview and ProMedica admitted exhibits A through H into evidence.

{¶42} On June 11, 2024, the trial court issued an order regarding the motion to stay proceedings pending arbitration.  The court noted that appellee's response to the motion to stay proceedings pending arbitration contained an affidavit from appellee attesting, in relevant part, "I have never seen the arbitration agreement referred to in Exhibit 'A' of the defendant's motion prior to it being given to me by my attorney to review," and "after reviewing the arbitration agreement, I did not sign such an agreement and do not believe the purported signature on the document is mine."  The court noted that, after the court issued an order holding Heartland's motion in abeyance, the court heard testimony from Vickie Willard, expert witness in forensic document examination, appellee, and appellee's daughter, Jodi Barker. Appellee's counsel also announced that they intended to call

Heartland's former employee, Amber Rivera, to testify, but she did not appear.

{¶43} After consideration, the trial court denied Heartland's motion to stay proceedings pending arbitration. The court found:

> [D]efendant [Heartland] supplied uncontroverted expert testimony establishing that the signature on the disputed arbitration agreement is that of plaintiff Beulah Handy, but . . . failed to establish that there was a meeting of the minds with the plaintiff in the execution of the agreement.

{¶44} The trial court observed that Heartland's facility doctor, Dr. David Apgar, prepared a medical note on May 29, 2021, and admitted into evidence at the hearing as plaintiff's Exhibit 2, that stated:

> She had gone home and had difficulty bearing weight at home and experienced nausea and vomiting, acute kidney injury and troponin elevation and was readmitted to the hospital. She was taking oxycodone and it was causing her to feel confused of [sic] hallucinations and experiencing nausea and vomiting.

In addition, the trial court noted that appellee's daughter, Jodi Barker, testified on cross-examination that her mother had been confused while in the hospital and "not herself mentally." Further, the court noted that, although defense counsel argued that no indication existed that appellee continued to receive opioid pain relievers when she executed the arbitration agreement, appellee produced evidence to the contrary. Specifically, Exhibit 5 contained Heartland's "Resident Controlled Substance Record,"

disclosed within documents the facility provided to appellee's counsel, that established that Heartland "administered Norco (controlled substance) to Ms. Handy on May 27, 2021, and May 28, 2021."

**{¶45}** The trial court opined that, at its essence, R.C. 2711.02(B) requires the court to be "satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration," *Dodeka v. Keith*, 2012-Ohio-6216 (11th Dist.). The court concluded that Heartland did not meet its burden to establish the existence of a meeting of the minds with appellee as it pertained to (1) the validity and enforceability of the arbitration agreement, and (2) appellee's capacity to contract.

**{¶46}** Therefore, the trial court wrote:

Based on the foregoing, the court FINDS:

1. Plaintiff produced evidence, some of which was derived from defendant Riverview's own files on the plaintiff, that Ms. Handy had experienced hallucinations and confusion prior to her admission at Heartland as a result of taking prescribed opioid pain medication.

2. Plaintiff produced a medication log prepared by Riverview establishing that Ms. Handy continued to receive opioid pain medication on May 27, 2021, and May 28, 2021, which was administered by the Riverview nursing staff.

3. At the hearing on May 30, 2024, counsel for Riverview was not aware that the plaintiff continued to receive opioid pain medication after her admission to the facility, but before the arbitration agreement was signed.

4. Plaintiff attested that she did not remember discussing

the arbitration agreement with Amber Rivera (who was not available for examination at the hearing on this motion) or signing the arbitration agreement.

5. According to the deposition testimony of Amber Rivera, she did not have an independent recollection of her meeting with the plaintiff, but rather, testified to her normal course and procedure when discussing the arbitration agreement with a patient.

6. While Dr. Apgar noted that the patient was alert and oriented during his initial examination, he did not see the plaintiff until May 29, 2021, which was the day after the arbitration agreement was executed.

7. Finally, the court found the testimony of Ms. Handy and Ms. Barker to be credible, honest, and sincere.

**{¶47}** Thus, the trial court denied appellant's motion concerning the arbitration issue and this appeal followed.

**{¶48}** In its sole assignment of error, appellant asserts that the trial court erred when it denied appellant's motion to stay the proceedings pending arbitration.

**{¶49}** "An appellate court reviews a trial court's decision to grant or deny a motion to compel arbitration or stay the proceedings under the abuse of discretion standard." *Ohio Valley Electric Corp. v. First Energy Corp.,* 2025-Ohio-938 (4th Dist.), citing *Primmer v. Healthcare Industries Corp.*, 2015-Ohio-4104, ¶ 8 (4th Dist.), quoting *Fields v. Herrnstein Chrysler, Inc.*, 2013-Ohio-693, ¶ 12 (4th Dist.), citing *K.M.P., Inc. v. Ohio Historical Society*, 2003-Ohio-4443, ¶ 14 (4th Dist.). An abuse of discretion implies that a court acted arbitrarily, unreasonably or

unconscionably.  However, on issues of law, such as issues of contractual interpretation, a trial court's decision to grant or to deny a stay of proceedings pending arbitration is generally subject to de novo review on appeal.  *Primmer*, *supra,* quoting *McFarren v. Emeritus at Canton*, 2013-Ohio-3900, ¶ 13 (5th Dist.), quoting *Hudson v. John Hancock Fin. Servs.,* 2007-Ohio-6997, ¶ 8 (10th Dist.).  *See also Alford v. Arbors at Gallipolis*, 2018-Ohio-4653, ¶ 9 (4th Dist.).

{¶50} Both the Ohio General Assembly and Ohio courts have expressed a strong public policy to favor arbitration.  *Taylor v. Ernst & Young, L.L.P.,* 2011-Ohio-5262, ¶ 18; *Alford, supra,* at ¶ 11, citing *Primmer*, *supra,* at ¶ 10, quoting *Hayes v. Oakridge Home*, 2009-Ohio-2054, ¶ 15, citing R.C. Chapter 2711.  Arbitration is favored because it provides an expeditious and economical means to resolve a dispute and has the added benefit of lessening the burden on crowded court dockets.  *Primmer*, *supra*; *Hayes* at ¶ 15.  This court has observed that "'"[i]n light of the strong presumption favoring arbitration, all doubts should be resolved in its favor.'""  *Alford, supra*, at ¶ 14, quoting *Primmer, supra,* at ¶ 12, quoting *Hayes* at ¶ 15.

{¶51} Under the Ohio Arbitration Act, R.C. Chapter 2711, a court may stay an action pending arbitration upon application of any party when the court is "satisfied that the issue involved in the action is referable to arbitration under an agreement in

writing for arbitration[.]"  *Kar v. TN Dental Management, LLC*, 2024-Ohio-6075, ¶ 35 (7th Dist.).  "The Ohio Arbitration Act sets forth a trial court's role in construing and enforcing arbitration agreements."  *Younce v. Heartland of Centerville*, 2016-Ohio-2965, ¶ 34 (2d Dist.), quoting *Lindsey v. Sinclair Broadcast Group, Inc.,* 2003-Ohio-6898, ¶ 15 (2d Dist.).  R.C. 2711.01(A) provides:

> A provision in any written contract . . . to settle by arbitration a controversy that subsequently arises out of the contract, . . . or any agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or arising after the agreement to submit, from a relationship then existing between them or that they simultaneously create, shall by valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract.  *See also Younce*, *supra,* at ¶ 35.

{¶52} In the case sub judice, appellant contends that, not only is arbitration a protected right encouraged under both Ohio and federal law, but also that R.C. 2711.02 requires a stay of proceedings in the case at bar.  R.C. 2711.02(B) provides:

> If any action is brought upon issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement, provided the applicant for the stay is not in default in proceeding with arbitration.

{¶53} Specifically, appellant argues that the trial court erred because the purported arbitration agreement is neither procedurally

nor substantively unconscionable.  However, as appellee points out, because an arbitration agreement is a matter of contract, *Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 2006-Ohio-657, ¶ 11, if the parties did not, in fact, form a contract, no need exists to then address the unconscionability issue.  Here, the appellee contends that no contract exist because, at the time appellee allegedly signed the purported agreement, appellee lacked the capacity to enter into a contract.

**{¶54}** The Eighth District has explained:

> Whether a party has agreed to arbitration is a matter of contract. *Maestle v. Best Buy Co.*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120, 2005 WL 1907282, ¶ 10, citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Palumbo v. Select Mgt. Holdings, Inc.*, 8th Dist. Cuyahoga No. 82900, 2003-Ohio-6045, 2003 WL 22674397, ¶ 18. Therefore, when deciding whether a party has agreed to arbitrate, courts should apply ordinary principles that govern the formation of contracts. *Seyfried v. O'Brien*, 2017-Ohio-286, 81 N.E.3d 961, ¶ 19 (8th Dist.), citing *First Options* at 944, 115 S.Ct. 1920; *Roberts v. KND Dev. 51, L.L.C.*, 8th Dist. Cuyahoga No. 108473, 2020-Ohio-4986, 2020 WL 6193635, ¶ 10, citing *Avery v. Academy Invests., L.L.C.*, 8th Dist. Cuyahoga No. 107550, 2019-Ohio-3509, 2019 WL 4131125, ¶ 9. " 'A valid arbitration agreement, like any contract, requires an offer and acceptance that is supported by consideration and is premised on the parties' meeting of the minds as to the essential terms of the agreement.' " *Rousseau v. Setjo, L.L.C.*, 8th Dist. Cuyahoga No. 109237, 2020-Ohio-5002, 2020 WL 6196168, ¶ 8, quoting *Corl v. Thomas & King,* 10th Dist. Franklin No. 05AP-1128, 2006-Ohio-2956, 2006 WL 1629740, ¶ 8. A party with a unilateral right to modify a contract does not have the right to make any kind of change whatsoever. *Maestle* at ¶ 20.

*Gibbs v. Firefighters Community Credit Union*, 2021-Ohio-2679, ¶ 14 (8th Dist.).  The Eleventh District also explained:

> When a party lacks contractual capacity, there can be no contract regardless of the terms as capacity pertains to formation . . . Resultantly, lack of capacity dispenses with any need to determine unconscionability. Substantive unconscionability, on the other hand, involves the fairness of the contractual terms.

*Pearson v. ManorCare Health Servs.,* 2015-Ohio-5460, ¶ 77 (11th Dist.). See, also, *Keybank, N.A. v. David,* 2024-Ohio-5333 (7th Dist.)

{¶55} As appellee points out, the trial court in the case at bar determined that no valid and enforceable arbitration agreement exists because the parties lacked a meeting of the minds. As appellee further points out, whether a party has the mental capacity to form a contract is a threshold question that a court must resolve before it determines whether an arbitration agreement is enforceable. *See Melaas v. Diamond Resorts U.S. Collections Dev., LLC*, 2021 ND 1 (2021). "If the contract containing the arbitration agreement was never formed and therefore does not exist, then the parties never agreed to arbitrate." *Id.*

{¶56} As noted above, essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained-for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Westerfield v. Three Rivers Nursing & Rehab. Ctr., LLC*, 2013-Ohio-512, ¶ 20 (2d Dist.), quoting *Minster Farmers Coop. Exchange Co., Inc. v. Meyer*, 2008-Ohio-1259, ¶ 28; *Kostelnik v. Helper*, 96 Ohio

St.3d 1, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D. Ohio 1976).

{¶57} In addition to being definite and certain, *Norman v. Schumacher Homes of Circleville, Inc.*, 2013-Ohio-2687, ¶ 18 (4th Dist.), "a meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik, supra,* at ¶ 16. "The parties must have a 'meeting of the minds' as to the essential terms of the contract in order to enforce the contract." *Id.,* citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). Ohio law requires mutual assent for a valid and enforceable contract, including arbitration agreements, and mutual assent is demonstrated when both parties agree to the essential terms of the contract. *See also Kar, supra,* 2024-Ohio-6075 at ¶ 38 (meeting of the minds regarding essential contract terms is requirement to contract enforcement.).

{¶58} In the case sub judice, the trial court determined that a meeting of the minds did not occur between the parties. The test for mental capacity to contract is "whether the person understood the nature of the transaction and the effects of her or his own actions and is similar to the test used to determine testamentary capacity." *Webb v. Anderson Children Trust*, 2020-Ohio-4975, ¶ 34 (1st Dist.), citing *Giurbino v. Giurbino,* 89 Ohio App.3d 646, 658 (8th Dist.1993). In the case at bar, the trial court found: (1)

appellee produced evidence that she had experienced hallucinations and confusion prior to her admission at appellant's facility as a result of taking prescription opioid pain medication, (2) appellee produced appellant's medication log that established that appellant continued to administer opioid pain medication to appellee on May 27, 2021 and May 28, 2021, (3) appellee attested that she did not remember discussing the arbitration agreement with appellant's employee and she did not remember signing the agreement, (4) appellant's employee, Amber Rivera, did not have an independent recollection of her meeting with appellee, (5) while Dr. Apgar described appellee as alert and oriented during his initial examination, he did not see appellee until May 29, 2021, the day after the execution of the arbitration agreement, and (6) appellee and Ms. Barker's testimony is "credible, honest, and sincere."

{¶59} Additionally, as outlined in appellee's brief Dr. Apgar's medical record noted that the hospital administered oxycodone to appellee, and it caused her "to feel confused of [sic] hallucinations and experiencing nausea and vomiting." Appellee's daughter, Jodi Barker, testified that appellee had been confused while in the hospital and "was not herself mentally." Although appellant did not administer oxycodone to appellee, Exhibit 5, "Resident Controlled Substance Record," documented that appellant administered opioid pain medication Norco and one and a half doses of Ambien to appellee on May 27, 2021 and Norco on May 28, 2021,

the day appellant presented the arbitration agreement to appellee to sign.  Moreover, as appellee points out, appellant's employee, Amber Rivera, had no memory of appellee, did not recall if appellee asked questions, did not recall what medications appellee took, did not know the status of appellee's cognitive ability, and attested that the BIM (Brief Interview for Mental Status) score in appellee's medical record, as recorded by appellant, is blank.

**{¶60}** After our review, we conclude that the trial court did not abuse its discretion when it denied appellant's motion to stay this case pending arbitration.  The evidence adduced during the trial court proceeding supports the court's findings that appellee did, in fact, lack the capacity to contract.  Appellee did not understand the nature of the transaction and the terms of the purported agreement.  *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440 (1996) ("trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial.")  Moreover, this finding dispenses with the need to address the unconscionability issue.

**{¶61}** Accordingly, for all of the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
     Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.